**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Mandrill Montgomery, | ) | |
| | ) | |
| Plaintiff, | ) | C/A No.: 6:23-cv-00395-TMC |
| | ) | |
| vs. | ) | |
| | ) | |
| Prisma Health, | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

Mandrill Montgomery ("Plaintiff") brought this action against Prisma Health ("Defendant") in the Greenville County Court of Common Pleas on December 21, 2022, asserting claims for: (1) retaliatory discharge under the False Claims Act; (2) Title VII racial discrimination (termination, hostile work environment, and disparate terms and conditions); (3) Title VII retaliation; and (4) defamation.[1]  (ECF No. 1-1).  After removing the case, (ECF No. 1), Defendant filed a partial motion to dismiss all but the retaliatory discharge claim brought under the False Claims Act.  (ECF No. 9).

The matter was referred to a magistrate judge who issued a report and recommendation ("Report"), recommending the undersigned dismiss Plaintiff's Title VII retaliation claim and his Title VII discrimination claims that he was subjected to a hostile work environment based on his race as well as to disparate terms and conditions of employment.  (ECF No. 13). The magistrate judge further recommended the motion be denied with respect to Plaintiff's defamation claim as well as to his Title VII discrimination claim that he was terminated based on his race.  *Id*.

---

[1] According to his complaint, Plaintiff filed "a Charge of Discrimination and [he] is in receipt of a Notice of Right to Sue from the United States Equal Employment Opportunity Commission." (ECF No. 1-1 at 3).

Plaintiff filed objections to the Report, (ECF No. 15), and Defendant submitted a reply, (ECF No. 16). Defendant did not file separate objections. This matter is now ripe for review.

## I.    BACKGROUND AND PROCEDURAL HISTORY[2]

Plaintiff, a black male who is a certified registered nurse anesthetist ("CRNA"), alleges he was employed with Defendant from June 2008 until he was terminated on September 28, 2021. (ECF No. 1-1 at 3, ¶¶ 6-8). Throughout his employment with Defendant, Plaintiff claims he experienced race discrimination within the anesthesiology department. (ECF No. 1-1 at 3, ¶9). On one occasion, there was a noose prominently hanging in the breakroom. *Id*. He reported it to management, but it appeared to him that Defendant did not investigate. *Id*. There is no indication in the complaint of when Plaintiff saw the noose or who hung the noose. On another occasion, a black student employee told Plaintiff that, while working with Brad Hoover, a white male supervisor,[3] the student witnessed Hoover fashioning a noose to the anesthesia cart. *Id*. There is no indication of when the student witnessed Hoover fashioning the noose or when the student informed Plaintiff of the noose.[4]

Additionally, Plaintiff contends there was continual exclusion of minorities from the anesthesia department. (ECF No. 1-1 at 3, ¶10). For most of Plaintiff's employment, the

---

[2] These facts are taken from Plaintiff's Complaint (ECF No. 1-1), as the court must accept Plaintiff's factual allegations as true for purposes of Defendants' motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor must the court "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts. Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

[3] In his response to the partial motion to dismiss, Plaintiff also refers to Hoover as "a management official of Defendant." (ECF No. 10 at 4).

[4] Plaintiff failed to provide in both his complaint and in his response to Defendant's partial motion to dismiss who hung the noose in the breakroom. In his objections to the Report, however, he provides he later learned that it was Hoover who hung that noose as well. (ECF No. 15 at 7).

department consisted of Plaintiff "and a handful of black anesthesia providers within the largest anesthesia department in the state." *Id*. According to his complaint, there have been only three black males in the department during the thirteen years Plaintiff was employed with Defendant, and he believes each of those men complained of race discrimination during their employment within the anesthesia department. *Id*. Additionally, Plaintiff claims "Dr. Taylor, a black female anesthesiologist who transferred from another hospital, experienced a hostile work environment based on her race." (ECF No. 1-1 at 4, ¶11). Plaintiff provides he "is aware of [Defendant's] administration soliciting complaints against Dr. Taylor from staff, including [from Plaintiff]." *Id*. In addition to Dr. Taylor, Plaintiff asserts an Indian female anesthesiologist was told there was no position available when there was an opening which was ultimately "race-based preferentially given to David Farr (a white male)." (ECF No. 1-1 at 4, ¶12). He further provides that "[i]n this racially hostile work environment, [he] tried to keep his head down, do the best job [he] could for the patients, and stay out of the proverbial limelight." (ECF No. 1-1 at 4, ¶13).

On August 28, 2021, Plaintiff provides that he was assigned to a thoracic case involving a patient with a complicated pulmonary condition. (ECF No. 1-1 at 4, ¶14). Due to limited staffing on Saturdays, Plaintiff gathered medication that he anticipated the patient might need in the event there would not be anyone available should it become an urgent or emergent necessity during the procedure. (ECF No. 1-1 at 5, ¶15). At the conclusion of the procedure, Plaintiff alleges he attempted to contact Dr. Matthew Vana,[5] a white male anesthesiologist, "for emergence," but Dr. Vana "was not present" despite being listed as in attendance on the medical record. *Id*. Ultimately, Plaintiff was able to extubate to a face mask and the oxygen saturation was adequate following the procedure; however, Plaintiff administered sugammadex, "the only

---

[5] The complaint mistakenly spelled Dr. Vana's name as "Dr. Vanna" throughout. The court will use the corrected spelling throughout this order, except in directly quoting the complaint.

medication that definitively reverses all paralytics, to the patient out of concern for a post-operative pulmonary event, atelectasis, or pneumonia." *Id.* Thereafter, he went to the Omnicell where he dropped off the drug box, replaced the sugammadex from the code box, and reported the chain of events to Dr. Vana. (ECF No. 1-1 at 5, ¶16). Plaintiff maintains his actions were necessary under the circumstances and that he did not do anything wrong. (ECF No. 1-1 at 5-6, ¶17).

The following day, a Sunday, Plaintiff "worked as normal", indicating he was scheduled to work 72 hours that week. (ECF No. 1-1 at 6, ¶18). However, on September 2, 2021, a Thursday, he was taken off the schedule, and Taylor Newsome, a white female whose position was not provided in the pleadings, advised him to stay home because he had already worked 40 hours. (ECF No. 1-1 at 6, ¶19). In response, Plaintiff, who had been working on an as-needed basis for the last two years of his employment with Defendant, asked for an explanation as to why he was unable to work more than 40 hours when other individuals were able to do so. (ECF No. 1-1 at 5-6; ¶¶17; 19). He also advised he felt such practice was discriminatory. *Id.* Plaintiff believes Newsome asked Shaniqua Cotton, a black female in charge of staffing, to contact Plaintiff and reiterate the policy. *Id.*

On September 5, 2021, Hoover, the same individual who is alleged to have fashioned the nooses, went to Plaintiff's house unannounced and without invitation. (ECF No. 1-1 at 6, ¶20). Hoover, "[w]ith hostility, . . . reaffirmed his authority over [Plaintiff] by aggressively telling [Plaintiff] that he was his direct report, and that Shaniqua Cotton needed to mind her own business." *Id.* Though Cotton had handled staffing issues for years, Hoover told Plaintiff not to communicate with her and to instead to go directly to him. *Id.*

4

Two days later, David Hanselman, a white male CRNA manager, texted Plaintiff, asking him to call him. (ECF No. 1-1 at 7, ¶21). During their subsequent telephone conversation, Hanselman informed Plaintiff that Dr. Vana had made multiple accusations against Plaintiff, and, in response, Plaintiff reported to Hanselman that Dr. Vana was engaging in billing fraud. *Id*. As an example, Plaintiff advised that Dr. Vana attested that he was present for emergence on August 28, 2021, when he actually never appeared. *Id*. Hanselman ended the conversation by saying he was to have a meeting with administration, including Wesley Lio, a personal friend of Dr. Vana. *Id*.

Plaintiff provides "Dr. Vanna made false allegations against [him] sourcing from August 28, 2021." (ECF No. 1-1 at 7, ¶22). He claims Dr. Vana accused him of stealing medication and documentation fraud. *Id*. He further provides such allegations are false, racially motivated, and retaliatory. *Id*. According to Plaintiff, "Dr. Vanna has engaged in a pattern of racially discriminatory conduct during his employment with [Defendant]." *Id*. He also adds that he had previously reported Dr. Vana "for administering a paralytic to an awake patient with an unsecured airway, jeopardizing the patient's safety." *Id*. On September 10, 2021, Plaintiff again reported to Defendant's management that Dr. Vana was committing billing fraud. (ECF No. 1-1 at 7, ¶23).

On September 27, 2021, an unnamed surgeon called Plaintiff and informed him that Dr. Vana had made racially offensive statements about Plaintiff in an operating room in the presence of staff. (ECF No. 1-1 at 8, ¶25). According to the complaint, Dr. Vana called Plaintiff a "slave" and made several statements inferring that Plaintiff is an incompetent CRNA. *Id*. The following day, Plaintiff again called and informed Defendant of his concerns, including Dr. Vana's alleged billing fraud. (ECF No. 1-1 at 8, ¶26). Though it is Plaintiff's understanding that

Dr. Vana is still employed with Defendant, Defendant terminated Plaintiff on September 28, 2021, and reported him to the Board of Nursing. (ECF No. 1-1 at 8; 13, ¶¶26; 49).

Plaintiff asserts he was terminated for "pretextual reasons" and "accused of falsifying a medical record sourcing from services provided on August 28, 2021 related to the administration of the drug sugammedex." (ECF No. 1-1 at 12, ¶42). He provides all four individuals who were involved in his termination, Dr. Vana, David Hanselman, Brad Hoover, and Aaron Toro, were white men and were all aware of his False Claims Act protected activities. (ECF No. 1-1 at 12, ¶¶43, 44). He also provides Defendant did not discipline him prior to his termination, and he was not afforded the corrective action plan that was outlined by the department manager and human resources and that was provided to his white coworkers. (ECF No. 1-1 at 12, ¶¶45, 46). At the time of his termination, he believes he was the only black male employee out of a department of over 100 nurse anesthetists and anesthesiologists. (ECF No. 1-1 at 12, ¶43). According to Plaintiff,

> [b]ecause of [his] race and retaliation for his protected activities opposing race discrimination and violations of the False Claims Act, [he] was subjected to harassment (hostile work environment), disparate terms and conditions of employment, unlawful termination, and the submission of an untrue complaint to the licensure board in an effort to have [Plaintiff's] professional CRNA licensure revoked.

(ECF No. 1-1 at 13, ¶50).

Plaintiff ultimately brought the instant action in the Greenville Court of Common Pleas on December 21, 2022, asserting claims for retaliatory and discriminatory discharge under the False Claims Act, Title VII race discrimination, Title VII retaliation, and defamation. (ECF No. 1-1 at 2-21). Defendant removed the case to the United States District Court for the District of South Carolina, (ECF No. 1), and filed a partial motion to dismiss Plaintiff's claims for race

discrimination, retaliation, and defamation.[6] (ECF No. 9). Plaintiff filed a response[7] (ECF No. 10), and the magistrate judge issued a Report and Recommendation ("Report"), recommending the motion be granted with respect to Plaintiff's Title VII discrimination claims that he was subjected to disparate terms and conditions of employment and a hostile work environment based on his race and with respect to Plaintiff's Title VII retaliation claim.  (ECF No. 13 at 21).  However, she recommended the motion be denied with respect to his Title VII discrimination claim that he was terminated based on his race and with respect to his defamation claim.  *Id.*

Plaintiff filed objections to the Report, opposing the magistrate judge's recommendation that the court grant Defendant's motion to dismiss his Title VII retaliation claim as well as his Title VII hostile work environment and disparate terms and conditions claims.  (ECF No. 15). Defendant filed a reply, requesting the undersigned adopt the magistrate judge's Report *without modification*.[8]  (ECF No. 16 at 1; 8) (emphasis added).

---

[6] Because Defendant did not move to dismiss Plaintiff's False Claims Act cause of action, the court declines to discuss in great detail the allegations in Plaintiff's complaint concerning that claim.

[7] In his response, Plaintiff requested leave to amend his pleadings if the court finds deficiencies exist that require an amendment for Plaintiff to further pursue any of the three claims subject to Defendant's motion.  (ECF No. 10 at 18).  In her Report, the magistrate judge noted that Plaintiff did not provide a proposed amended complaint for consideration, nor has he indicated what additional factual allegations might be contained in an amended complaint.  (ECF No. 13 at 21, n.15).  Plaintiff did not mention his request to amend his complaint in his objections to the Report nor has he filed a motion to amend or provided the court with any such proposed amendments.  Such a request must be made by motion.  Fed. R. Civ. P. 7, 15.

[8] Defendant did not object to the magistrate judge's recommendation to deny its motion with respect to Plaintiff's Title VII termination claim or with respect to his defamation claim. Accordingly, the undersigned must only review for clear error the magistrate judge's recommendation on these issues.  *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017).  Having found no clear error, and in the absence of any objections, the court adopts the magistrate judge's recommendations as to Plaintiff's defamation claim and Title VII termination claim and DENIES the motion to dismiss (ECF No. 9) as to these claims.

## II.    STANDARD OF REVIEW

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). Thus, "[t]o trigger de novo review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah*, 66 F.4th at 460 (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017); *see also Elijah*, 66 F.4th at 460 (noting that "[i]f a litigant objects only generally, the district court reviews the magistrate's recommendation for clear error only"). Furthermore, "'the court is not obligated to consider new arguments raised by a party for the first time in objections to the magistrate's Report.'" *Floyd v. City of Spartanburg S.C.*, Civ. A. No. 7:20-cv-1305-TMC, 2022 WL 796819, at *9 (D.S.C. Mar. 16, 2022) (quoting *Elliott v. Oldcastle Lawn & Garden, Inc.*, No. 2:16-cv-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar. 31, 2017); *see also Elijah*, 66 F.4th at 460 n. 3 (noting "district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation").

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir.

2009). "[T]he legal sufficiency of a complaint is measured by whether it meets the standard stated in Rule 8 [of the Federal Rules of Civil Procedure] . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted)." *Id.* Rule 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard requires that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court stated that to survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" *Id.* at 663 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when [a party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* The plausibility standard "asks for more than a sheer possibility that a [party] has acted unlawfully." *Id.* Rather, "[i]t requires [a party] to articulate facts, when accepted as true, that 'show' that [the party] has stated a claim entitling [them] to relief[.]" *Francis*, 588 F.3d at 193 (quoting *Twombly*, 550 U.S. at 557). Such "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

### III.    DISCUSSION

**1. Title VII Discrimination**

Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

As part of his Title VII race discrimination cause of action, Plaintiff alleges he was wrongfully terminated based on his race, he was subjected to disparate terms and conditions of employment because of his race, and he was subjected to a hostile work environment. (ECF No. 1-1 at 15, ¶¶62; 63; 70). As discussed, the magistrate judge found Plaintiff provided sufficient factual allegations that his race was a motivating factor for his termination. Plaintiff, however, objects to her recommendation that the court dismiss his disparate terms and conditions claim and hostile work environment claim.

### A.    Disparate terms and conditions

"Disparate treatment occurs when an employer treats certain people less favorably than others on the basis of a protected classification such as race." *Carter v. Ball*, 33 F.3d 450, 456 n.7 (4th Cir. 1994). At the motion to dismiss stage, a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination[,]" but, rather, the "pleading standard established in *Iqbal* and *Twombly* applies[.]" *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (citations omitted). In other words, at the motion to dismiss stage, a plaintiff is

only required to allege facts to satisfy the elements in compliance with *Iqbal*. *Id.* Accordingly, the question is "whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010)). However, the elements of a prima facie case "inform[] a court's evaluation" at this stage. *See Tynes v. Mayor and City Council of Baltimore*, C.A. No. 1:22-cv-1452-ELH, 2023 WL 2664233, at *10 (D. Md. Mar 28, 2023) (citations omitted). Such elements of a prima facie case for disparate treatment include: "(1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019).

Following his assertion that he was subject to disparate terms and conditions of employment, Plaintiff makes the following allegations in his complaint, which are quoted verbatim:

- [Defendant] gave preferential treatment to Dr. Vanna because of his race (white) and worse treatment toward [Plaintiff] because of his race (black). Dr. Vanna has engaged in a pattern of performance deficiencies and egregious conduct warranting discipline and termination. [Plaintiff] is aware of multiple complaints about Dr. Vanna's erratic and offensive behavior and concerns raised about his patient care, with little to no follow up from administration. [Defendant] has consistently given either none or the bare minimum in discipline to Dr. Vanna for his performance deficiencies and egregious conduct. Whereas, [Plaintiff] is a black male, with no record of discipline since [Plaintiff's] employment began in June 2008, was terminated for false reasons on the mere accusation of Dr. Vanna. (ECF No. 1-1 at 15-16, ¶64).

- [Plaintiff] was also subjected to disparate terms and conditions of employment related to Dr. Vanna's complaint and any purported investigation into that complaint sourcing from the events on August 28, 2021. (ECF No. 1-1 at 16, ¶65).

- [Plaintiff] was subjected to a biased and targeted investigation. (ECF No. 1-1 at 16, ¶66).

11

- [Plaintiff] was also subjected to disparate terms and conditions of employment related to [Defendant] not applying the progressive discipline policy to [Plaintiff] when it has done so for white employees. For example, [Defendant] deviated from its Anesthesia Operating Room Pharmacy Controlled Substance Policy wherein there are several levels for corrective action prior to termination and notification to the Board of Nursing, none of those were utilized with [Plaintiff]. (ECF No. 1-1 at 16, ¶67).

- [Plaintiff] was also subjected to disparate terms and conditions of employment related to hours, scheduling, and compensation. For example, on multiple occasions [Plaintiff's] hours and paychecks were inaccurate. It required multiple contacts by [Plaintiff] to get paid for the work that [Plaintiff] performed for [Defendant]. (ECF No. 1-1 at 16, ¶68).

- [Defendant] failed to engage in any progressive discipline of [Plaintiff] because of his race. (ECF No. 1-1 at 16, ¶69).

The allegations in these paragraphs can be separated into the following categories: allegations concerning subjecting Plaintiff to "a biased and targeted investigation" (paragraphs 65; 66); subjecting Plaintiff to disparate terms and conditions related to his hours, scheduling, and compensation (paragraph 68); and terminating Plaintiff without engaging in any progressive discipline (paragraphs 64; 67; 69). After restating these paragraphs from his complaint in his response to Defendant's partial motion to dismiss, Plaintiff summarily argued "[t]hese factual allegations meet the plausible standard for disparate terms and conditions of employment." (ECF No. 10 at 12).

In her Report, the magistrate judge found no factual support for Plaintiffs' conclusory allegations that he was subjected to a biased and targeted investigation. (ECF No. 13 at 12). She also did not find factual support for his allegation that he was "subjected to disparate terms and conditions of employment related to hours, scheduling and compensation." *Id*. She explained "nowhere in the complaint does Plaintiff allege that any errors in his hours and paychecks were motivated by race or that other non-black employees did not also receive inaccurate paychecks. *Id*. As to the remaining paragraphs from the complaint that concern Defendant's decision to

terminate Plaintiff without applying the progressive discipline policy and without also terminating Dr. Vana, the magistrate judge provided she addressed those allegations in her analysis of Plaintiff's wrongful termination claim. (ECF No. 13 at 12, n.11).

Plaintiff filed objections to the Report. In the only "specific objection" he raises with respect to his disparate terms and conditions claims, Plaintiff provides he "sufficiently pled that he was treated differently because of his race when he was denied work and complained to management that this policy was discriminatory. Additionally, Plaintiff pled that Defendant's progressive discipline policy was not applied to him, but was applied to white employees." (ECF No. 15 at 2). Other than again restating verbatim paragraphs 64-69 of his complaint, which include the generalized investigation allegations, *id*. at 5-6, Plaintiff made no reference in his objections to any issues surrounding any alleged "biased and targeted" investigation.[9] He instead focuses on his disparate hours, scheduling, and compensation claim and his disparate discipline claim. The court addresses each of these in turn.

---

[9] Therefore, the court must only review the magistrate judge's finding with respect to this issue for clear error. Having found none, the court adopts the magistrate judge's finding that Plaintiff did not provide sufficient facts to withstand a motion to dismiss as to his disparate investigation claim. Moreover, the court questions whether an investigation into alleged misconduct such as that described by Plaintiff constitutes an "adverse action" for purposes of a Title VII discrimination claim. Even assuming, however, that a disparate investigation claim can stand alone as a separate action, these facts do not support allowing Plaintiff to pursue one here as he has failed to establish that any investigation resulted in some form of employment injury that was independent of the injury caused by his ultimate termination. *See Jenkins v. Baltimore City Fire Dep't*, 862 F.Supp.2d 427, 445-46 (D. Md. 2012) (discussing how other courts in the Fourth Circuit have handled disparate investigation claims and concluding that "even if an investigation can amount to a separate 'adverse employment action' under certain circumstances" those circumstances do not exist when a plaintiff fails to allege "the investigation resulted in some form of employment injury that was independent of injury caused by the alleged disparate promotion or discipline").

### i. Hours, Scheduling, and Compensation

In the portion of his complaint that outlines his disparate hours, scheduling, and compensation allegations, Plaintiff provides he "was also subjected to disparate terms and conditions of employment related to hours, scheduling, and compensation. For example, on multiple occasions [Plaintiff's] hours and paychecks were inaccurate. It required multiple contacts by [Plaintiff] to get paid for the work that [Plaintiff] performed for [Defendant]." (ECF No. 1-1 at 16, ¶68). Again, the magistrate found no allegation that any error in his hours and paychecks were motivated by race. (ECF No. 13 at 12). Following the magistrate judge's Report, Plaintiff now argues he sufficiently showed that any differences in his hours, scheduling, and compensation was due to race when he alleged in the complaint that not allowing him to work over 40 hours a week was "discriminatory." (ECF No. 15 at 4).

In paragraph 19 of his complaint, Plaintiff provides he told Newsome that he "was aware of other employees that are allowed to work more than 40 hours within a week and if she was taking [him] off to please email [him] an explanation because the practice was discriminatory." (ECF No. 1-1 at 6, ¶19). Plaintiff has indicated that he believes he was the only black male employee on the entire anesthesia team at Prisma Health. (ECF No. 1-1 at 12, ¶43). Additionally, although Newsome's job title is unknown, her position and authority included scheduling the number of hours certain employees could work. Plaintiff alleged that he was "aware of other employees that are allowed to work more than 40 hours within a week." (ECF No. 1-1 at 6, ¶19). Accordingly, in light of the above, the undersigned concludes Plaintiff has alleged sufficient facts to proceed on his disparate hours, scheduling, and compensation claim at this stage of the case.

ii.     **Disparate Discipline**

Plaintiff also contests the magistrate judge's handling of his allegations in paragraphs 64, 67, and 69 of his complaint that concern Defendant's refusal to apply its progressive discipline policy to him.  (ECF No. 15 at 4-5).  As a reminder, in these paragraphs, Plaintiff argues Defendant gave Dr. Vana "the bare minimum in discipline . . . for his performance deficiencies and egregious conduct" whereas it terminated Plaintiff, who had no disciplinary record, and reported him to the Board of Nursing.  (ECF No. 1-1 at 15-16, ¶64).  He also contends Defendant did not apply the progressive discipline policy to Plaintiff because of his race when it had applied the policy for white employees. (ECF No. 1-1 at 16, ¶¶67; 69). The magistrate judge did not discuss these allegations in the portion of her Report that addresses Plaintiff's disparate terms and conditions claims, explaining that she had addressed them in the portion of her Report that concerned Plaintiff's wrongful termination claim.  (ECF No. 13 at 12, n.11).

Plaintiff contends the magistrate judge improperly narrowed the scope of his "disparate te[r]ms and conditions adverse action."  (ECF No. 15 at 5).  He does not object to the magistrate judge's reliance on the aforementioned allegations in support of her recommendation that Defendant's motion to dismiss should be denied with respect to his wrongful termination claim. Rather, Plaintiff asserts these allegations also support a disparate terms and conditions claim because they show he was denied equal terms and conditions of employment (i.e., that Defendant did not apply the progressive disciplinary policy to him when it does apply it to white employees). *Id*. The undersigned disagrees.

The allegations in question concern the decision to terminate Plaintiff without engaging in any form of discipline.  The adverse action that affected Plaintiff's terms, conditions, and/or benefits of employment was, ultimately, his termination.  It was not decisions made to discipline

him prior to his termination.  In fact, Plaintiff provides he had never been disciplined prior to his termination.  Plaintiff did not sustain an injury independent of that caused by his termination from Defendant's refusal to apply its progressive discipline policy.  Accordingly, the court finds these allegations do not support a separate claim for disparate discipline.

### B.  Hostile work environment

"When racial animus in the workplace creates a hostile work environment, requiring an affected employee to work in it amounts to intentional racial discrimination by the employer and is actionable under Title VII."  *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022).  In order to establish a hostile work environment claim, Plaintiff must show (1) unwelcome conduct; (2) that is based on his protected status; (3) which is sufficiently severe or pervasive to alter his conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.  *Strothers v. City of Laurel, Maryland,* 895 F.3d 317, 328 (4th Cir. 2018).  The Fourth Circuit has recently reaffirmed the following:

> A hostile-work-environment claim will only succeed when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Unlike a typical claim of intentional discrimination based on a discrete act, a hostile-work-environment claim's "very nature involves repeated conduct."

*McIver*, 42 F.4th at 407 (internal quotations omitted).

Plaintiff failed to specify which allegations form the basis of his hostile work environment claim in his complaint.  In his response to Defendant's partial motion to dismiss, Plaintiff argued the displaying of a noose, Dr. Vana calling him "a slave" in the presence of operating room staff, and being harassed at his home on September 5, 2021, by a white male supervisor amount to plausible facts supporting a racially hostile work environment.  (ECF No. 10 at 10-11).

The magistrate judge found these allegations insufficient to plausibly state a hostile work environment claim. Initially, she noted there was nothing in the complaint plausibly alleging Hoover's uninvited September 5, 2021 visit to Plaintiff's house had anything to do with race. (ECF No. 13 at 14). As to the noose and "slave" reference, the magistrate judge concluded that, "although these allegations are certainly egregious, . . . they are insufficient to satisfy the severe and pervasive standard, particularly where the complaint does not allege when Plaintiff saw the noose and specifically alleges that he does not know who hung it." *Id*. at 15.

In his objections to the Report, Plaintiff maintains the observance of the noose in the breakroom, which he now provides was hung by Hoover, and Dr. Vana calling him a slave are enough to substantiate his hostile work environment claim.[10] (ECF No. 15 at 7). Plaintiff argues that the displaying of a noose coupled with calling him a slave "compounded an unambiguous message of hate and hostility towards Plaintiff based solely on his race." *Id*. at 8. Thus, he contends that, while these incidents were not occurring daily, they were severe enough to create a hostile work environment.

Initially, the court notes there does not appear to be any dispute that the conduct in question was unwelcomed. Further, the hanging of a noose and referring to a black individual as a "slave" is sufficient to support a plausible inference that the actions were related to Plaintiff's race. The question before the court is whether this conduct was sufficiently severe or pervasive to alter Plaintiff's conditions of employment and to create an abusive work environment. If so, this court must then determine whether Plaintiff has pled sufficient facts that the conduct is imputable to Defendant to survive its motion to dismiss.

---

[10] Plaintiff does not object to the magistrate judge's analysis of the claim regarding Hoover's visit to his home or her conclusion that the complaint did not plausibly allege this had anything to do with race.

      i.       **Sufficiently severe or pervasive**

The court recognizes that while the magistrate judge referred to the "sufficiently severe *and* pervasive standard" (ECF No. 13 at 5) (emphasis added), which seems to indicate a conjunctive requirement, the correct standard is in the disjunctive – requiring either sufficient severity *or* sufficient pervasiveness. The severe or pervasive element of a hostile work environment claim has both a subjective and objective component. Plaintiff must show that he "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Perkins v. Int'l Paper Co*., 936 F.3d 196, 208 (4th Cir. 2019). "Workplace conduct is not measured in isolation." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). "[W]hen determining whether the harassing conduct was objectively 'severe or pervasive,' [the court] must look 'at all the circumstances,' including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

In arguing the conduct at issue here is sufficiently severe or pervasive, Plaintiff relies, in part, on the Fourth Circuit's opinion in *Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264 (4th Cir 2015). In *Boyer-Liberto*, a white food and beverage manager followed the plaintiff, an African American female cocktail waitress, throughout the restaurant, yelling at her, threatening her, and referring to her as a "porch monkey" for walking through the kitchen to deliver a drink to a patron in the nightclub. *Boyer-Liberto*, 786 F.3d at 270. The following day, the plaintiff went to the management office to report the manager's conduct to the Food and Beverages Director. *Id*. During that meeting, the manager came into the office, interrupted the plaintiff,

and stated "I need to speak to you, little girl." *Id*. The plaintiff left the office, and the manager reprimanded her for passing through the kitchen the prior night. *Id*. She threatened the plaintiff that she was "gonna get [her]" and that she was going to go to the hotel owner. *Id*. She again called the plaintiff a porch monkey. *Id*. Days later, the plaintiff was discharged, and she subsequently filed a lawsuit which included a claim for hostile work environment. *Id*.

When considering the third element of the plaintiff's hostile work environment claim, the Fourth Circuit recognized that "viable hostile work environment claims often involve repeated conduct", but acknowledged that, per United States Supreme Court ("USSC") jurisprudence, a single "isolated incident of harassment, if extremely serious, can create a hostile work environment." *Boyer-Liberto*, 786 F.3d at 268, 277. Additionally, the Fourth Circuit recognized the harasser's status may be a significant factor in measuring the severity of harassing conduct as "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Id*. at 278 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)). Considering the evidence before it, the Fourth Circuit accepted Petitioner reasonably believed that the manager could make a discharge decision or recommendation that would be rubber-stamped by the owner. *Id.* at 280. Therefore, it deemed the manager to have been the plaintiff's supervisor, and, given the seriousness of the term "porch monkey", it found the manager's two uses of the epithet severe enough to engender a hostile work environment.[11] *Id*.

---

[11] Plaintiff also relies on the Fourth Circuit's unpublished opinion in *Alford v. Martin & Gass, Inc.*, wherein the Fourth Circuit was "willing to assume" the plaintiff established the severe or pervasive element where his coworkers hung a noose near his workspace and where his supervisors: made comments like "Black people like Dr. Pepper" and "How do you get into that black skin?;" used the "n word" in conversation with him; and tried to scare Plaintiff by running around with a white cloth on his head with eyeholes cut out. 391 Fed. Appx. 296, 298-304 (4th Cir. 2010). The *Alford* court ultimately concluded the conduct could not be imputed to the employer. *Id*. at 304.

In determining Plaintiff's allegations were not sufficient to state a plausible hostile work environment claim, the magistrate judge relied on the Fourth Circuit's decisions in *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398 (4th Cir. 2022), *Perkins v. International Paper Co.*, 936 F.3d 196 (4th Cir. 2019), and *Irani v. Palmetto Health*, 767 F.App'x 399 (4th Cir. 2019), which were all decided after the *Boyer-Liberto* opinion. The court provides a brief summary of these decisions herein to provide context for its decision on Plaintiff's hostile work environment claim.

In *McIver*, during her twenty plus years of employment with Bridgestone, Laverne McIver saw a picture of a noose hanging on a machine that was operated by two black coworkers in 2006, a picture of racist caricatures of Trayvon Martin in the men's bathrooms in 2012, and, at some point before 2018, saw a picture of a monkey made of tire tubing with a noose around its neck and personally observed another monkey made of tire tubing depicted with no eyes. *McIver*, 42 F.4th at 403-04. Additionally, around 2007, she overheard her coworker say "we were doing fine without black people on this crew." *Id*. at 403.

---

Additionally, Plaintiff cites the Eleventh Circuit's decision in *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1253-54 (11th Cir. 2014), wherein the court found the plaintiff, a black male who worked for the employer for one year, raised a disputed issue that the harassment he experienced was frequent and severe where: his coworkers wore clothing and displayed paraphernalia with the confederate flag; he regularly saw racist graffiti in the men's restroom; his supervisor carved the term "porch monkey" into aluminum, and, on plaintiff's last day, his supervisor approached him, came within inches of his face, and screamed at him that "he wasn't a goddamn racist."

Plaintiff also relies on *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 575 (D.C. 2013), which involved allegations that one of the plaintiff's superiors yelled "get out of my office n*****", and, when asked about a raise, another superior told the plaintiff "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money." The court concluded a jury could find the supervisors' conduct sufficiently or pervasive to establish a hostile work environment under § 1981 and added the supervisor's use of the word "n*****" "might well have been sufficient to establish a hostile work environment." *Id*. at 577. The plaintiff in this case had worked for Fannie Mae for approximately one year.

In its analysis of McIver's hostile work environment claim, the Fourth Circuit acknowledged that "[t]he use of a noose to intimidate a Black person is a despicable and heinous act" and that "describing an African American as a monkey . . . is degrading and humiliating in the extreme." *Id*. at 410 (quoting *Boyer-Liberto*, 786 F.3d at 280). The court, however, distinguished the facts before it from those in *Boyer-Liberto*, providing "none of this racial harassment targeted McIver, none of the acts are attributed to a supervisor, and, other than the caricature drawn in the MTS restroom, the conduct occurred in other Bridgestone departments." *Id*. As to her coworker's comments that they "were doing fine without black people on this crew," the court noted the individual who made that comment was not McIver's supervisor. *Id*. The court further acknowledged that all of the conduct "occurred long ago and intermittently over seven years" with the most recent instance of racial animus occurring more than five years before McIver fled her claim. *Id*. Thus, it found her allegations failed to create a genuine question of material fact that racial discrimination in Bridgestone's MTS department was so severe or pervasive that it constituted a hostile work environment. *Id.*

In *Perkins*, Matthew Perkins, alleged he heard of an individual wearing a Ku Klux Klan hat at work and that a white employee had complained that he was being asked to work like a n*****. *Perkins*, 936 F.3d at 204. In deciding his hostile work environment claim, the Fourth Circuit noted these two incidents took place several years apart and years before Perkins had decided to retire. *Id*. at 210. It ultimately concluded the conduct was "too remote to be pervasive, and, thus, insufficient to create a genuine issue of material fact." *Id*.

In an unpublished per curiam opinion, the Fourth Circuit concluded that a supervisor twice referring to an Indian employee as "Achmed the Terrorist" over an 18-month period was not sufficiently severe or pervasive to be actionable under a hostile work environment claim.

*Irani v. Palmetto Health*, 767 Fed.Appx. 399, 416-17 (4th Cir. 2019). The court again distinguished its decision from *Boyer-Liberto*, finding it significant that the infrequent racist comments were not made in connection with employment decisions or during the assertion of his authority over the employee. *Id*. at 417.

Here, the conduct in question was Hoover hanging the noose in the breakroom and Dr. Vana calling Plaintiff a slave in front of operating room staff. Additionally, as noted in the complaint, Plaintiff alleged that he was made aware of a second noose having been hung by Hoover on an anesthesia cart. As the Fourth Circuit has acknowledged "the use of a noose to intimidate a black person is despicable and heinous," *McIver*, 42 F.4th at 410, and this court finds referring to a black person as a slave is similarly despicable as well as degrading, reprehensible, and inexcusable, particularly here where the comment was made in front of other employees whom Plaintiff also presumably worked with. Though the initial noose was not placed on any of Plaintiff's workspaces like in some of the above cited cases, it was hung in a breakroom where all staff, including Plaintiff, could see it. The second noose was hung on an anesthesia cart, and Plaintiff has alleged that he was one of the only black employees on the anesthesia team. (ECF No. 1-1 at 12, ¶43). The fact that each of these acts was performed by Plaintiff's superiors, and two *separate* superiors within the department at that, certainly increases their severity.

Furthermore, the court notes that both *McIver* and *Perkins* dealt with cases that had the benefit of discovery and a further development of the record than what the court presently has before it, as both cases dealt with the summary judgment stage of the proceedings. The court recognizes that in this case there is a question of when the nooses were hung and when Plaintiff reported such to the Defendant, which no doubt could weigh heavily on whether Plaintiff has met

his burden of establishing sufficient severity and pervasiveness of the conduct alleged on the actual merits. However, a large part of the motion to dismiss stage is to ensure that Defendant has a fair and adequate opportunity to respond to the claims against it with sufficient factual pleadings in the complaint to put Defendant on notice of the claim. It is unquestionable that if Plaintiff reported such egregious act to Defendant, which, in taking the facts alleged in the complaint as true, the court must assume he did, Defendant is aware of when such action took place and should be able to respond to such allegations accordingly with little issue. Should the timing ultimately be determined remote in relation to Plaintiff's separation, as was the case in *McIver*, the court is confident that Defendant will address such at the appropriate time.

In contrast to the uncertain timeliness of the noose incidents, the complaint clearly alleges that Plaintiff learned about the "slave" comment on a specific date - September 27, 2021, just one day before he was terminated and during the course of his back-and-forth communications with management regarding the investigation into his August 28, 2021 conduct. (ECF No. 1-1 at 8, ¶25). The complaint alleges that the next day, it was *Plaintiff* who initiated a call to Defendant to further discuss his concerns. Accordingly, at the time of the call, it appears that Plaintiff still worked for Defendant and seemingly remained interested in continuing to work for Defendant.[12] However, he was terminated sometime later that day.[13] *Id.* It is true that Plaintiff was only employed with Defendant for a brief period following his learning of the "slave" comment. However, at this stage, Plaintiff has sufficiently pled facts to meet the subjective component of

---

[12] The complaint indicates following the information regarding this call that "if anyone should have been terminated it was Dr. Vanna, not Montgomery." (ECF No. 1-1 at 8, ¶26).

[13] It is unclear from the complaint whether Plaintiff was terminated during that same call or was terminated at a later point in the day. However, the complaint does indicate that four individuals were involved in the termination itself – Dr. Vana, Hanselman, Hoover, and Toro. (ECF No. 1-1 at 12, ¶43). Therefore, it appears that the termination happened *later* in the day since the initial phone call was made, in part, to discuss Dr. Vana's alleged misconduct.

"sufficiently pervasive or severe[,]" with such derogatory term coming from a direct supervisor of Plaintiff and being spoken in front of Plaintiff's colleagues. Additionally, taking the facts of the complaint as true at this stage, one of the surgeons in the operating room was so offended by the racial slur and conduct that he called Plaintiff directly to report it. (ECF No. 1-1 at 8). At this stage of the proceedings, the court finds the above sufficient to support a plausible inference as to the objective component.

Accordingly, for these reasons, given the totality of the circumstances, including the fact that one supervisor allegedly hung two separate nooses within the hospital in areas known to be frequented by Plaintiff and other employees and that a second supervisor referred to Plaintiff as a "slave" in the presence of other staff, doctors, and colleagues, the court finds that Plaintiff has sufficiently pled alleged facts to justify an inference that Defendant's conduct was "sufficiently pervasive or severe" to support a claim for a hostile work environment.[14]

### ii.    Imputable to Defendant

In determining an employer's liability for conduct forming the basis of a hostile work environment claim, the USSC has held that an employer is vicariously liable "when a supervisor takes a tangible employment action." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). It defined "tangible employment action" as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

---

[14] Additionally, the court notes that the complaint contains various other allegations of racial discrimination within the workplace of which Plaintiff was aware. Though Plaintiff was not the alleged target of that other conduct listed, Plaintiff specifically noted in the complaint that due to that conduct, he "tried to keep his head down, do the best job [he] could do for his patients, and stay out of the proverbial limelight." (ECF No. 1-1 at 4, ¶13). These further allegations of racial discrimination in the workplace further bolster the totality of the circumstances present in this case to add to the potential severity and pervasiveness of racially-discriminatory conduct.

responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. Relying on

USSC precedent, in an unpublished opinion, the Fourth Circuit has recognized that:

> In determining whether the conduct alleged may be imputed to the employer, the
> employer's liability "may depend on the status of the harasser." *Vance v. Ball
> State Univ.*, 570 U.S. 421, 424, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013). When a
> supervisor is the harasser and the "harassment culminates in a tangible
> employment action, the employer is strictly liable." *Id*. To make such a showing,
> a plaintiff must demonstrate both that any action taken against her was "tangible,"
> such that the action constituted a "significant change in employment status," and
> that there was "some nexus" between the harassment and the tangible action
> taken. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257,
> 141 L.Ed.2d 633 (1998); *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331-
> 32 (4th Cir. 2012).

*Ray v. Int'l Paper Co.*, 909 F.3d 661, 667 (4th Cir. 2018). *See also Dulaney v. Packaging Corp.

of Am.*, 673 F.3d 323, 328 (4th Cir. 2012) (recognizing that [o]rdinarily, an employer would be

liable under the doctrine of respondeat superior if a victim's supervisor created a hostile work

environment or sexually harassed the victim himself").

It is clear Plaintiff's termination constitutes a "tangible employment action." As

discussed, Plaintiff contends Dr. Vana referred to him as a slave and Hoover hung a noose in the

breakroom and on an anesthesia cart. According to Plaintiff's complaint, both Dr. Vana and

Hoover were his superiors, and both were involved in his termination. (ECF No. 1-1 at 12, ¶43).

The court, thus, finds Plaintiff has pled sufficient facts to survive Defendant's motion to dismiss

on this issue, and the motion to dismiss (ECF No. 9) is DENIED as to Plaintiff's hostile work

environment claim.

### 2. Title VII Retaliation

Title VII also prohibits an employer from discriminating against an employee because he

has opposed an employment practice made unlawful by Title VII or because he has participated

in any manner in an investigation, proceeding, or hearing under Title VII. *Villa v. CavaMezze*

*Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017); 42 U.S.C. § 2000(e)-(3)(a).  "[T]o establish a prima facie claim of retaliation in violation of Title VII, 42 U.S.C. § 2000e–3(a), a plaintiff must show that '(1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action.'"  *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997) (quoting *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985)).

A.  **Protected Activity**

"Employees engage in protected oppositional activity when, inter alia, they 'complain to their superiors about suspected violations of Title VII.'"  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (quoting *Bryant v. Aiken Regional Med. Ctrs. Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003)).  In his complaint, Plaintiff did not specify what protected activities he engaged in that form the basis of his retaliation claim.  Instead, he generally provides that he: "engaged in protected activities under Title VII when he complained about harassment and disparate treatment on the basis of race.  [Plaintiff's] opposition activities, as described above, are protected activities under Title VII.  [Plaintiff] was retaliated against for these protected activities." (ECF No. 1-1 at 17, ¶74).

In his response to Defendant's partial motion to dismiss, however, Plaintiff clarified the protective activities that form the basis of his Title VII retaliation claim are those described in paragraphs 9, 25, and 26 of his complaint.  (ECF No. 10 at 13).  These paragraphs concern the reporting of the noose to management, Plaintiff learning of Dr. Vana calling him a slave, and Plaintiff's September 28, 2021 call to Defendant to inform Defendant of his "concerns, *including* billing fraud by Dr. Vanna."  He did not specify in his complaint what additional concerns he

reported during the September 28, 2021 call. (ECF No. 10 at 14). However, in his response to Defendant's motion, he states it is "apparent" that he also voiced concerns about Dr. Vana calling him a slave given that he learned of that allegation the day before the call.[15]  *Id*.

The magistrate judge reviewed *all* of Plaintiff's factual allegations, including the report to management of the noose, the complaint regarding working over 40 hours a week, and Plaintiff's multiple reports that Dr. Vana had engaged in billing fraud.  (ECF No. 13 at 17).  She noted "most of these complaints have nothing to do with alleged violations of Title VII" and concluded "the only allegation of a Title VII-related complaint is when Plaintiff reported seeing a noose in the breakroom."[16]  *Id*.  She added, however, Plaintiff failed to provide when he saw the noose during his thirteen years of employment with Defendant or whether the four individuals who made the decision to terminate him knew that he had previously reported the noose to management.  *Id* at 18.  Accordingly, the magistrate judge concluded "the Complaint fails to state a plausible Title VII retaliation claim as 'it stops short of the line between possibility and plausibility' and alleges facts that only make it a 'sheer possibility' that Plaintiff was terminated because of his reporting the noose."  *Id*.

Following the filing of the magistrate judge's Report, Plaintiff reframed, or arguably, clarified his retaliation argument.  In his objections to the Report, he now argues he engaged in protected activity on September 2, 2021, when he expressed that he felt the prohibition against

---

[15] In his response to Defendant's motion to dismiss, Plaintiff did not assert that his September 2, 2021 telephone call, which concerned his complaint that the refusal to allow him to work more than 40 hours a week was "discriminatory," constituted a protected activity.

[16] The magistrate judge concluded the complaint concerning working more than 40 hours a week did not constitute a Title VII complaint because Plaintiff failed to allege he complained that the policy was *racially* discriminatory.  (ECF No. 13 at 17).  She also dismissed Plaintiff's argument that he allegedly complained of Title VII protected activity during the September 28 call in which he again reported Dr. Vana's billing fraud.  *Id*. at 17 n.13.

him working over 40 hours a week when others were able to do so was "discriminatory."[17]  (ECF No. 15 at 10).  Plaintiff provides he "communicated to Defendant that he believed they were engaging in employment discrimination, and it was not required of Plaintiff to state specifically what kind of discrimination he was referring to."  *Id*. at 9.  In support, he relies on the decisions in *Okoli v. City of Baltimore*, 648 F.3d 216 (4th Cir. 2011) and *Spencer v. Town of Bedford*, 2019 WL 2305157 (W.D. Va. May 23, 2019).

In *Okoli*, John Stewart, the director of Baltimore's Commission on Aging and Retirement, hired Katrina Okoli to serve as his executive assistant on June 21, 2004. *Okoli v. City of Baltimore*, 648 F.3d 216, 217 (4th Cir. 2011).  In September 2004, Stewart began engaging in inappropriate and unwelcomed conduct towards Okoli, which included touching Okoli's legs during meetings, forcibly kissing her, and propositioning her to have sex with him. *Id*. at 217-18.  On January 26, 2005, Okoli emailed the executive director asking to speak with him about "a complaint."  *Id*. at 218.  When he did not respond, she again emailed him on March 23, 2005, expressing a desire to "file a harassment complaint against my supervisor, Mr. John P. Stewart."  *Id*.  Thereafter, on April 1, 2005, Okoli sent a formal complaint to multiple individuals, stating that her supervisor: "displayed unethical and unprofessional business characteristics, e.g., harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity."  *Id*.  The complaint was promptly forwarded to Stewart, and he fired Okoli that afternoon.  *Id*.

---

[17] In his objections, Plaintiff asserts that the September 2, 2021 complaint was a protected activity, that Hoover's subsequent appearance at his house was a "retaliatory action," and his termination, which was twenty-six days after the protected activity on September 2, 2021, is sufficient evidence of causality.  (ECF No. 15 at 10).

Okoli filed a complaint which included a retaliation cause of action. *Okoli*, 648 F.3d at 219. The parties disagreed as to whether Okoli's April 1 letter constituted protected activity as it did not explicitly mention sexual harrassment. *Id*. at 223. In reaching its conclusion on this issue, the Fourth Circuit provided:

> Several sister circuits have noted that sexual harassment complaints need not include "magic words" such as "sex" or "sexual" to be effective. *See, e.g.*, *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir.2006) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition."); *Olson v. Lowe's Home Ctrs. Inc.*, 130 Fed.Appx. 380, 391 n. 22 (11th Cir. 2005) (unpublished) ("There is no magic word requirement. That is, the employee need not label the events 'sexual harassment' in order to place an employer on notice of the offending behavior.").

*Id*. at 224 n.8. Thus, the Fourth Circuit ultimately concluded:

> Here, it was enough for Okoli to twice complain of "harassment," even if it might have been more ideal for her to detail the sexual incidents she later relayed. While Okoli's January 26 email to Gillard referenced only a "complaint," her March 23 email was entitled "Harassment Complaint.". . . Okoli's April 1 memo to the Mayor further described "unethical and unprofessional business characteristics, e.g., harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity.". . .
>
> **The City surely should have known that Okoli's complaints of "harassment" likely encompassed sexual harassment. Indeed, Okoli's description of "unethical," "degrading and dehumanizing" conduct suggest severe misbehavior related to her identity—not a mere workplace squabble**. Moreover, based on his alleged conduct, Stewart himself surely would have known that Okoli was complaining of sexual harassment.

*Id*. at 224 (emphasis added).

In *Spencer v. Town of Bedford*, 2019 WL 2305157 (W.D. Va. May 23, 2019), Spencer was hired as Bedford Police Department's Operations Lieutenant. Prior to her termination, Spencer expressed to the Chief that she felt subordinate officers were resistant to her because she was female and that those officers were dissatisfied with "having a female in charge." *Id*. at *1; *4. The district court concluded that, since some of Spencer's complaints were sex-based,

"Spencer had an 'objectively reasonable belief' that she was engaging in protected activity, and the Town should have been alerted to that fact." *Id*. at *4. Therefore, it held Spencer established she engaged in protected activity when she complained to her superior of discrimination based on her gender. *Id*. at *4.

Here, as noted previously, the court disagrees with the magistrate judge's determination that Plaintiff failed to specify that non-black workers were allowed to work more than 40 hours a week, as Plaintiff specifically indicated in his complaint that he believed he was the only black male employee in the anesthesia department and that he was aware of other workers who were allowed to work more than 40 hours. Additionally, after Plaintiff indicated that after he asked for an explanation for the cut in hours "because the practice was discriminatory" that then it was his understanding that "Newsome asked Shaniqua Cotton (black female in charge of staffing) to contact Montgomery and reiterate the policy." (ECF No. 1-1 at 6, ¶19). Based on that response, it is plausible to infer that Newsome understood that Plaintiff was referring to racial discrimination. While it is true that there is no direct indication that Newsome was his supervisor or superior, from the face of the complaint it appears that Newsome had the ability and authority to cut Plaintiff's hours, which indicates the ability and authority to take at least some tangible employment action against Plaintiff. Accordingly, the court finds that Plaintiff has sufficiently pled facts to allege he engaged in a protected activity such to survive a motion to dismiss.

**B. Adverse Action**

As noted several times herein, Plaintiff was ultimately terminated from his position and reported to the state licensing board. Accordingly, the court finds that Plaintiff has pled sufficient facts to support a finding of an adverse action to survive the motion to dismiss.

**C.    Causality**

In terms of Title VII retaliation claims, "a causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Roberts v. Glenn Indust. Grp. Inc*., 998 F.3d 111, 126 (4th Cir. 2021) (citations omitted). "An adverse action that bears sufficient temporal proximity to a protected activity may, along with the existence of other facts, suggest adverse employment action occurred because of that protected activity." *Id.* As indicated previously, on a motion to dismiss, the correct standard is whether sufficient facts are pled to make such claim *plausible,* so Plaintiff need not fully prove causality, but instead provide sufficient facts that could support an inference that causality exists.

Here, the court agrees with the magistrate judge that Plaintiff did not provide when he saw and reported the noose over the course of his thirteen-year employment with Defendant, and that, therefore, he cannot establish a causal connection between the reporting of the noose and his termination – *standing alone*. However, Plaintiff did indicate that he complained of the discriminatory practice regarding the cutting of his hours on September 2, 2021, and that sometime after his conversation with Newsome requesting an explanation, that Newsome had Cotton, a black female in charge of staffing, contact Plaintiff.  (ECF No. 1-1 at 6, ¶19). This conversation with Cotton must have occurred prior to September 5, 2021, as this is when Hoover, *the same individual alleged to have hung both nooses*,[18] came to Plaintiff's house after hours and uninvited. *Id.* at 6, ¶20. Plaintiff describes Hoover's conduct that day as hostile and threatening, stating that Hoover "reaffirmed his authority over [Plaintiff,]" indicated that Cotton "needed to mind her own business," and ordered Plaintiff "not to communicate with [Cotton]

---

[18] Plaintiff notified management of one of the nooses. However, it is unclear whether Hoover knew that Plaintiff had complained.

anymore and everything about [Plaintiff] need[ed] to go through him only." *Id*. In viewing the contemporaneous nature of Plaintiff's allegation that the hours allocation was discriminatory, the request for "reiteration" of the policy by a black staff member in response, and the unwelcomed, aggressive home visit by a superior – during which the superior showed knowledge of Plaintiff having at least discussed the hours issue with Cotton – the court finds that there are sufficient facts to support a plausible inference that Hoover knew of the nature of Plaintiff's protected activity of questioning the allegedly discriminatory nature in which his hours were cut. Hoover was one of four supervisors that ultimately terminated Plaintiff on September 28, 2021 – just three weeks after Hoover's visit to Plaintiff's home. Accordingly, the court finds that based on these facts, which are further supported by several facts in the record that indicate Hoover had demonstrated his animus towards black individuals in the past within confines of the workplace, Plaintiff has sufficiently pled facts to support plausibility as to the causality element of Title VII retaliation.

Accordingly, the court sustains Plaintiff's objections as to this claim and finds that Plaintiff has sufficiently pled a Title VII retaliation claim. The motion to dismiss (ECF No. 9) is DENIED as to this claim.

## IV.    CONCLUSION[19]

Based on the foregoing, the court **ADOPTS** the magistrate judge's Report (ECF No. 13) in part and respectfully **DECLINES TO ADOPT** the Report in part.  Specifically, the court adopts the portions recommending that the motion to dismiss (ECF No. 9) be denied with respect to Plaintiff's defamation claim and Plaintiff's Title VII discrimination claim that he was terminated based on his race.  The court also adopts the portion of the Report recommending the

---

[19] In issuing this order, the court expresses no opinion as to the ultimate disposition of the remaining claims.

motion be granted as to Plaintiff's disparate terms and conditions claims concerning disparate discipline and disparate investigation. However, the court respectfully declines to adopt the remaining portions of the Report.  Defendant's motion to dismiss (ECF No. 9) is **GRANTED** as to Plaintiff's claims for disparate discipline and disparate investigation.  Defendant's motion to dismiss is **DENIED** with respect to Plaintiff's defamation claim, Title VII wrongful termination claim, Title VII hostile work environment claim, Title VII disparate hours, scheduling, and compensation claim, and Title VII retaliation claim.

 **IT IS SO ORDERED.**

s/Timothy M. Cain   
United States District Judge

Anderson, South Carolina
February 5, 2024

33